# In the United States Court of Federal Claims

No. 93-655C

(E-Filed:  September 25, 2018)

| | |
|---|---|
| ANAHEIM GARDENS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Regulatory Takings Claims; Motion for Summary Judgment, RCFC 56; Right to Pre-Pay Mortgages on Subsidized Low-Income Housing Developments; No Reasonable Investment-Backed Expectation in a Property Right Destroyed Prior to Purchase of Property; Insufficient Evidence of Economic Impact to Support a Permanent Regulatory Taking.

Harry J. Kelly, Washington, DC, for plaintiffs.

A. Bondurant Eley, Senior Trial Counsel, with whom were Joseph H. Hunt, Assistant Attorney General, Robert E. Kirschman, Jr., Director, Franklin E. White, Jr., Assistant Director, Christopher J. Carney, Senior Litigation Counsel, Isaac B. Rosenberg and Kara M. Westercamp, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

CAMPBELL-SMITH, Judge.

The court has before it defendant's motion for summary judgment, ECF No. 422, which has been extensively briefed.[1]  Defendant's motion is brought pursuant to Rule 56

---

[1]     The following briefs and appendices have been considered by the court: (1) defendant's motion for summary judgment, ECF No. 422; defendant's proposed findings of uncontroverted fact, ECF No. 423; defendant's appendix, ECF No. 423-1; plaintiffs' opposition brief, ECF No. 439; plaintiffs' response to defendant's proposed findings of uncontroverted fact, ECF No. 440; plaintiffs' appendix, ECF No. 441-1 through 441-4; defendant's reply brief, ECF No. 459; defendant's supplemental summary judgment brief, ECF No. 477; plaintiffs' supplemental opposition brief, ECF No. 479; and, defendant's supplemental reply brief, ECF No. 482.

of the Rules of the United States Court of Federal Claims (RCFC).  Oral argument was requested by plaintiffs but is deemed to be unnecessary by the court.[2]  Defendant's motion is **GRANTED**.  In consequence, the parties' pending motions in limine regarding expert trial testimony, ECF Nos. 430, 452, are **DENIED** as moot.

I.     Background

This case has a long history; much of the pertinent procedural background of this dispute may be found in Anaheim Gardens v. United States, 125 Fed. Cl. 88 (2016) (Anaheim).  There are approximately fifty plaintiffs asserting takings claims in these consolidated cases.[3]  Id. at 94.  Currently the parties are preparing for trial on the claims of the First Wave Plaintiffs (FWPs).  Id. at 94-95.  The list of FWPs was finalized on September 30, 2013, ECF No. 332, and discovery proceeded as to these plaintiffs shortly thereafter.  Thus, the parties have had approximately five years to prepare for trial on the regulatory takings claims of the FWPs.

The six FWPs are Buckman Gardens L.P., Chauncy House Company, Cedar Gardens Associates, Rock Creek Terrace L.P., 620 Su Casa Por Cortez, and 3740 Silverlake Village, L.P.[4]  Anaheim, 125 Fed. Cl. at 95.  All of the FWPs assert takings

---

[2]     Plaintiffs requested oral argument not in their opposition brief in the first round of briefing defendant's motion, but in their second opposition brief submitted during a round of supplemental briefing ordered by the court.  See ECF No. 479 at 1.  At that point, however, the parties had been fully heard on every necessary issue.  The court notes, too, that plaintiffs submitted a thorough supplemental opposition brief.  ECF No. 479.  Plaintiffs were afforded six weeks, overall, to prepare that brief after the court's briefing order issued, ECF No. 470, and two weeks to respond, in particular, to defendant's arguments in its supplemental summary judgment brief.

[3]     These plaintiffs were originally grouped into two multi-plaintiff cases, Anaheim Gardens, et al. v. United States, Case No. 93-655, and Algonquin Heights Associates, et al. v. United States, Case No. 97-582.  When those cases were consolidated, all plaintiffs, except the named plaintiffs, were assigned individual case numbers and were terminated from the multi-plaintiff cases.  See Order of April 30, 2013, ECF No. 327.  All of the subsequent history of this case, however, is docketed in the lead case, Case No. 93-655. Id.

[4]     The six FWPs are docketed, see supra note 3, in the following cases:  (1) Buckman Gardens L.P., et al. v. United States, Case No. 97-5837, which includes both the partnership and the individual partners as plaintiffs; Chauncy House Company v. United States, Case No. 97-5845; Cedar Gardens Associates v. United States, Case No. 93-6568; Rock Creek Terrace L.P. v. United States, Case No. 93-6578; 620 Su Casa Por Cortez v. United States, Case No. 93-6580; and Silverlake Village, L.P. v. United States, Case No. 93-6582.  The docket in Case No. 93-6582 incorrectly identifies the plaintiff as Silverlake

claims based on the enactment of the "Preservation Statutes," which affected their mortgage prepayment rights for government loans on subsidized apartment complexes. The relevant statutes are identified in the following excerpt from Anaheim:

> Plaintiffs allege that the enactment of two federal statutes, the Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, § 202, 101 Stat. 1877 (1988) (ELIHPA), and the Low-Income Housing Preservation and Resident Homeownership Act of 1990, Pub. L. No. 101-625, 104 Stat. 4249 (1990) (LIHPRHA), collectively known as the Preservation Statutes, prevented them from exercising their contractual right to repay their mortgages upon the twentieth anniversary of the issuance of the mortgage. Plaintiffs' prepayment rights were later restored by a third federal statute, the Housing Opportunity Program Extension Act of 1996 (Hope Act [or HOPE Act]), Pub. L. No. 104-120, 110 Stat. 834 (1996).

125 Fed. Cl at 93-94.

The parties agree that the court's analysis of the regulatory takings alleged by the FWPs is governed by Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978) (Penn Central). As summarized by the United States Court of Appeals for the Federal Circuit, the three Penn Central factors are: (1) "'[t]he economic impact of the regulation on the claimant'"; (2) "'the extent to which the regulation has interfered with distinct investment-backed expectations'"; and (3) "'the character of the governmental action.'" CCA Assocs. v. United States, 667 F.3d 1239, 1244 (Fed. Cir. 2011) (CCA Associates II) (quoting Penn Central, 438 U.S. at 124) (alteration in original). Most of the court's inquiry here will focus on the investment-backed expectations and economic impact prongs of the Penn Central test.

Two preliminary issues, however, were raised by the court in its order requiring supplemental briefing from the parties.[5] ECF No. 470. First, the court required more

_____

Village, L.P., not 3740 Silverlake Village, L.P., although the court, in its opinion of October 2, 2014, found that the proper plaintiff in that case is 3740 Silverlake Village, L.P. See ECF No. 374 at 12 ("Plaintiffs may file a sixth amended complaint designating 3740 Silverlake Village, L.P. as the named plaintiff pursuing a takings claim based on the Silverlake Village Apartments."); ECF No. 376 at 3 (correcting the name of 3740 Silverlake Village, L.P. in the sixth amended complaint filed in this lead case); ECF No. 412 at 3 (showing the correct plaintiff name in the seventh amended complaint filed in this lead case).

[5]   Plaintiffs argue that these two issues were waived by defendant. ECF No. 479 at 10 n.3. The court does not agree. The court ordered supplemental briefing on the two

robust briefing concerning the "reasonable investment-backed expectations" of plaintiff 620 Su Casa Por Cortez, whose purchase of the subject property occurred after the enactment of the Preservation Statutes. Id. at 2. Second, the court required additional briefing from the parties addressing the question of whether the takings alleged by the FWPs are more properly characterized as temporary regulatory takings, or as permanent regulatory takings. Id. at 2-3. The analysis section of this opinion will discuss these two topics before reviewing the arguments raised in defendant's motion for summary judgment. Before turning to its analysis, however, the court addresses the standard of review that is applicable to defendant's motion.

II.     Standard of Review

        "[S]ummary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotations and citations omitted). The party moving for summary judgment will prevail "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citations omitted).

        A genuine dispute of material fact is one that could "affect the outcome" of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." Dairyland Power, 16 F.3d at 1202 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). A summary judgment motion is properly granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and for which that party bears the burden of proof at trial. Celotex, 477 U.S. at 324.

        The United States Supreme Court has instructed that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. A nonmovant will not defeat a motion for summary judgment "unless there is sufficient evidence favoring the nonmoving party for [the fact-finder] to return a verdict for that party." Id. at 249 (citation omitted). "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof

_____

issues, which are fundamental to plaintiffs' takings claims. The court deemed it more efficient to address these issues in supplemental briefing prior to trial.

at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power, 16 F.3d at 1202 (citing Celotex, 477 U.S. at 323).

III.    Analysis

    A.    Challenge Specific to Plaintiff 620 Su Casa Por Cortez

        1.    No Reasonable Investment-Backed Expectation in a Mortgage Prepayment Right Once LIHPRHA Was Enacted

The government argues that 620 Su Casa Por Cortez did not have reasonable investment-backed expectations in a mortgage prepayment right, because the subject property was purchased after LIHPRHA went into effect.[6] See ECF No. 477 at 11-14. As the Federal Circuit has stated:

> The purchaser who buys a parcel with a known and valid regulatory restriction on certain uses cannot complain that she thereafter sustains an economic loss when the restriction is enforced.  If the purchaser paid more than the property with the restriction on it is worth, the loss is the result of an error in market judgment, not a result of the restriction as such.  In the parlance of takings law, the purchaser does not have reasonable expectations that the property can be used for the prohibited purpose; to assess the government for such a loss is to give the purchaser a windfall to which she is not entitled.

Palm Beach Isles Assocs. v. United States, 231 F.3d 1354, 1363 (Fed. Cir. 2000).

A similar statement of the law was provided in an earlier case:

> In legal terms, the owner who bought with knowledge of the restraint could be said to have no reliance interest, or to have assumed the risk of any economic loss.  In economic terms, it could be said that the market had

---

[6]    In its supplemental reply brief, defendant appears to have abandoned its standing challenge to the takings claim of 620 Su Casa Por Cortez.  ECF No. 482 at 5.  Even if defendant has not done so, the court agrees with plaintiffs, for the reasons stated in their supplemental opposition brief, that 620 Su Casa Por Cortez has the requisite standing for its takings claim.  See ECF No. 479 at 11-12 (arguing that LIHPRHA takings claims accrue not on the statute's enactment date, but on the property's mortgage prepayment date); see also Cienega Gardens v. United States, 503 F.3d 1266, 1287-88 & n.20 (Fed. Cir. 2007) (Cienega X) (describing the alleged takings periods in that case as starting on the properties' mortgage prepayment dates).

already discounted for the restraint, so that a purchaser could not show a loss
in his investment attributable to it.

<u>Loveladies Harbor, Inc. v. United States</u>, 28 F.3d 1171, 1177 (Fed. Cir. 1994), <u>abrogated
on other grounds as noted in</u> <u>Bass Enters. Prod. Co. v. United States</u>, 381 F.3d 1360 (Fed.
Cir. 2004) (<u>Bass Enterprises</u>).

    As the Federal Circuit explained more recently: "The purpose of consideration of
plaintiffs' investment-backed expectations is to limit recoveries to property owners who
can demonstrate that 'they bought their property in reliance on a state of affairs that did
not include the challenged regulatory regime.'" <u>Cienega Gardens v. United States</u>, 331
F.3d 1319, 1345-46 (Fed. Cir. 2003) (<u>Cienega VIII</u>) (citing <u>Loveladies Harbor</u>, 28 F.3d at
1177); <u>see also</u> <u>Norman v. United States</u>, 429 F.3d 1081, 1093 (Fed. Cir. 2005) (stating
that because the plaintiffs in that suit "were not only constructively but also actually
aware of the applicable wetland restrictions, . . . [t]hey could not have made those
purchases in reliance on a 'state of affairs' that did not include those restrictions")
(citations omitted).  Further, acknowledging the guidance provided by <u>Palazzolo v.
Rhode Island</u>, 533 U.S. 606 (2001), the Federal Circuit has commented that "it is
particularly difficult to establish a reasonable investment-backed expectation in
circumstances like these [where actual knowledge of the restriction predated the real
estate purchase]."  <u>Norman</u>, 429 F.3d at 1092-93 (citing <u>Palazzolo</u>, 533 U.S. at 630).

    Plaintiffs argue that because the regulations implementing LIHPRHA had not been
finalized at the time 620 Su Casa Por Cortez purchased the subject property, an investor
would still retain reasonable investment-backed expectations in the mortgage prepayment
right.  ECF No. 479 at 9-10.  But the statute itself was sufficiently detailed to destroy any
reasonable expectation as to the free exercise of the prepayment right.  <u>See</u> <u>Cienega
Gardens v. United States</u>, 503 F.3d 1266, 1272-73 & n.4 (Fed. Cir. 2007) (<u>Cienega X</u>)
(discussing the extensive conditions placed on the mortgage prepayment right by
numerous provisions of LIHPRHA); <u>see also</u> ECF No. 482 at 9-10 (citing LIHPRHA
provisions restricting the mortgage prepayment right).  Further, plaintiffs have asserted
that the FWPs were sophisticated investors in low-income housing properties, in general,
ECF No. 439 at 30-35, and that the investors in 620 Su Casa Por Cortez had a particular
focus on the mortgage prepayment right, <u>id.</u> at 34-35.  The statute gave such investors
adequate notice of the effects of LIHPRHA on the prepayment right.  Defendant notes,
too, that plaintiffs' briefing in the "ripeness" phase of this litigation indicates that the
FWPs knew of the effects of LIHPRHA on the FWPs' mortgage prepayment right at the
time that statute was enacted.  ECF No. 482 at 11-13.  Plaintiffs' reliance on the absence
of finalized regulations to claim that 620 Su Casa Por Cortez did not know the impact of
LIHPRHA on the mortgage prepayment right, ECF No. 479 at 9-10, is unavailing.

    Here, 620 Su Casa Por Cortez could not possess reasonable investment-backed
expectations in a mortgage prepayment right.  Plaintiff 620 Su Casa Por Cortez purchased
the subject property <u>after</u> LIHPRHA had destroyed the prepayment right that would

otherwise have been available to the owner of that property under the terms of the underlying agreements with the United States Department of Housing and Urban Development (HUD).  Applying <u>Palazzolo</u>, <u>Norman</u>, <u>Cienega VIII</u>, <u>Palm Beach Isles</u>, and <u>Loveladies Harbor</u> to the circumstances of this case, the sophisticated investors in the 620 Su Casa Por Cortez partnership could not have relied on a regime in which the prepayment right existed.  As a result, 620 Su Casa Por Cortez did not have reasonable investment-backed expectations in the property right alleged to have been taken by the government here.  As to this prong of the <u>Penn Central</u> analysis for the takings claim of 620 Su Casa Por Cortez, there is no genuine dispute of material fact.

2.   In the Absence of Any Reasonable Investment-Backed Expectations, the Regulatory Takings Claim of 620 Su Casa Por Cortez Must Be Dismissed

Plaintiffs argue that the takings claim of 620 Su Casa Por Cortez must survive summary judgment even if the court should find that the investment-backed expectations factor weighs against this claim.  ECF No. 479 at 22-23.  Plaintiffs' argument is largely based on <u>Murr v. Wisconsin</u>, 137 S. Ct. 1933 (2017).  ECF No. 479 at 22-23.  Defendant argues, and the court must agree, that <u>Murr</u> cannot save the takings claim of 620 Su Casa Por Cortez.  ECF No. 477 at 13-14.

Although there is language in <u>Murr</u> which suggests that a regulatory takings analysis under <u>Penn Central</u> must be "flexible," 137 S. Ct. at 1943, there is no statement in <u>Murr</u> which precludes this court from dismissing a takings claim where there is no reasonable investment-backed expectation in the free exercise of a property right. Indeed, the Court in <u>Murr</u> held that a regulatory takings claim was properly dismissed, at least in part, because the owners had purchased the property after the complained-of regulatory restrictions were already in place.  <u>See id.</u> at 1949 ("Petitioners cannot claim that they reasonably expected to sell or develop their lots separately given the regulations which predated their acquisition of both lots.").

The court notes, too, that the Federal Circuit has expressly stated that the absence of reasonable investment-backed expectations may be sufficient cause to dismiss a regulatory takings claim.  <u>See</u> <u>Norman</u>, 429 F.3d at 1094 (citing <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1005 (1984) (<u>Monsanto</u>); <u>Golden Pac. Bankcorp. v. United States</u>, 15 F.3d 1066, 1074 (Fed. Cir. 1994) (<u>Golden Pacific</u>)).  And, while there may be cases of extraordinary government action that excuse the absence of reasonable investment-backed expectations, <u>see id.</u> at 1094 n.6 (citing <u>Hodel v. Irving</u>, 481 U.S. 704, 714 (1987)), the court sees no such extraordinary action in the enactment of the

Preservation Statutes.[7]  Here, the regulatory takings claim of 620 Su Casa Por Cortez is unsupported by reasonable investment-backed expectations and must be dismissed.

Plaintiffs also argue that two Supreme Court cases preclude a grant of summary judgment on a regulatory takings claim where the character of the government action has "result[ed] in the abrogation of a fundamental property right."  ECF No. 439 at 15 (citing Hodel and Kaiser Aetna v. United States, 444 U.S. 164 (1979)).  Turning first to Kaiser, two decisions of this court, affirmed in relevant part on appeal, have rejected similar contentions that Kaiser is analogous to the regulatory takings claims at issue in those suits.  See CCA Assocs. v. United States, 91 Fed. Cl. 580, 599-601 (2010) (CCA Associates I), aff'd in relevant part, 667 F.3d 1239 (Fed. Cir. 2011); Norman v. United States, 63 Fed. Cl. 231, 248 (2004), aff'd, 429 F.3d 1081 (Fed. Cir. 2005).  As for Hodel, it was the "extraordinary" character of the governmental action and the strength of the economic impact factor which excused an absence of reasonable investment-backed expectations in that case.  See Norman, 429 F.3d at 1094 n.6 (citing Hodel, 481 U.S. at 714); see also CCA Associates I, 91 Fed. Cl. at 600-01 (distinguishing Hodel from the regulatory takings that were alleged to have occurred as a result of the enactment of the Preservation Statutes).  The court must agree with defendant, ECF No. 459 at 9 n.1, that Hodel and Kaiser are inapposite to the takings claims at issue in this case and to defendant's motion for summary judgment.

Plaintiffs' broadest argument is that the Penn Central test is fundamentally incompatible with the dismissal of a regulatory takings claim, on summary judgment, where only one of the Penn Central factors has been considered to be dispositive by the court.  ECF No. 439 at 11, 39-41.  As the court reads the Federal Circuit's decision in Norman, however, dismissal of a takings claim is indeed possible where the absence of reasonable investment-backed expectations is considered to be the sole dispositive Penn Central factor.  429 F.3d at 1094 (citing Monsanto and Golden Pacific).

Defendant relies on Norman, but also points to another Federal Circuit decision, Good v. United States, 189 F.3d 1355, 1363 (Fed. Cir. 1999), as support for its contention that "[f]ailure to satisfy the reasonable-expectations prong requires judgment in favor of the Government."  ECF No. 422 at 10 (emphasis added).  In light of Hodel, as construed in Norman, 429 F.3d at 1094 n.6, defendant's contention appears to be overbroad.  The full text of the relevant footnote in Norman is as follows:

---

[7]   Although plaintiffs insist that Cienega VIII found that the enactment of the Preservation Statutes was "extraordinary" for the purposes of weighing the character of the governmental action factor in the Penn Central analysis, ECF No. 439 at 15, the only use of that term in Cienega VIII is to describe the regulation discussed in Hodel, not the Preservation Statutes, Cienega VIII, 331 F.3d at 1338 (citing Hodel, 481 U.S. at 715-16).

The Supreme Court's decision in <u>Hodel v. Irving</u>, 481 U.S. 704, 107 S. Ct. 2076, 95 L. Ed. 2d 668 (1987), is [illustrative]. In that case, the Court clearly found that two of the three <u>Penn Central</u> factors—economic impact and character of the government's action—weighed in favor of just compensation, and that in light of the "extraordinary" nature of the government action, the absence of reasonable investment-backed expectations did not defeat the takings claim. <u>See</u> <u>Hodel</u>, 481 U.S. at 714, 107 S. Ct. 2076.

429 F.3d at 1094 n.6. <u>Hodel</u> thus provides the exception to the rule proposed by defendant.

In the court's view, <u>Good</u> stands for the proposition that the reasonable investment-backed expectations factor <u>may</u> indeed be dispositive, on summary judgment, of a regulatory takings claim. <u>See</u> 189 F.3d at 1363 (stating that "the government is entitled to summary judgment on a regulatory takings claim where the plaintiffs lacked reasonable, investment-backed expectations, even where the challenged government action 'substantially reduc[ed] the value of plaintiffs' property.'" (quoting <u>Avenal v. United States</u>, 100 F.3d 933, 937 (Fed. Cir. 1996)) (alteration in original)).

The court acknowledges that a mechanistic application of the <u>Penn Central</u> factors is generally disfavored. <u>See, e.g.</u>, <u>Cienega X</u>, 503 F.3d at 1278 ("To make [the determination whether a regulatory taking has occurred], there is no set formula."); <u>Bass Enterprises</u>, 381 F.3d at 1370 ("The Supreme Court's decision in <u>Tahoe-Sierra</u> further stressed that a gestalt approach should be used when evaluating all of the <u>Penn Central</u> factors, including the 'character of the Government action' factor.") (citing <u>Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency</u>, 535 U.S. 302, 330 (2002)). In the circumstances of this case, however, 620 Su Casa Por Cortez purchased the subject property after the mortgage prepayment right had been destroyed by the Preservation Statutes. This fact clearly shows the absence of any reasonable investment-backed expectation of the exercise of that extinguished prepayment right. In these circumstances the court finds that the investment-backed expectations factor of the <u>Penn Central</u> analysis is dispositive of the regulatory takings claim of 620 Su Casa Por Cortez; plaintiff 620 Su Casa Por Cortez must be dismissed from these consolidated cases.[8]

B.      Whether a Temporary or Permanent Regulatory Takings Analysis Applies to Each of the Takings Alleged by the FWPs

---

[8]      Even if the court has erred in granting summary judgment as to 620 Su Casa Por Cortez solely based on the investment-backed expectations factor, the court notes that the court's more general holding on the <u>Penn Central</u> factors, once economic injury is considered, is applicable to all six FWPs, including 620 Su Casa Por Cortez.

The court asked the parties to submit supplemental briefing addressing the nature of the alleged takings asserted by the FWPs, and to determine whether these alleged regulatory takings were temporary or permanent in nature. There were strong reasons to resolve this question before trial, not thereafter:

> The court does not believe it prudent to conduct a trial on takings claims where the type of regulatory taking is uncertain and in dispute, and where the relevance of the evidence of economic injury presented is also uncertain because the nature of the taking is undetermined.

ECF No. 470 at 3. Although the parties' supplemental briefs are quite thorough, neither side proffers an analysis as to the character of the alleged takings with which the court can agree.

In plaintiffs' supplemental opposition brief, all six FWPs are alleged to have suffered temporary regulatory takings. ECF No. 479 at 7. In defendant's supplemental summary judgment brief, five of the FWPs, those who sold their properties through LIHPRHA procedures, are alleged to have suffered permanent regulatory takings, if any. ECF No. 477 at 7. The sixth FWP, the only FWP to enter into a continuing use agreement with HUD under the terms of LIHPRHA, rather than a sale, is alleged by the government to have suffered a temporary taking, if any. Id. Both plaintiffs and the government assert that under either a permanent or temporary takings theory, their side must prevail on the economic injury factor of the Penn Central analysis. ECF No. 477 at 16-18; ECF No. 479 at 25-37.

Although the appropriate test discerned in the precedent discussed below was not advanced, in full, by either side in this dispute, the court finds that the regulatory takings alleged by the FWPs are all permanent in nature. This finding has a profound impact on the evidence of economic injury that would be relevant to the court's Penn Central analysis, were this case to proceed to trial on the claims of the FWPs. This finding is also dispositive of defendant's motion for summary judgment, because plaintiffs' evidence regarding the economic injury suffered by the FWPs is insufficient to prevail at trial.

1.    Measuring Economic Injury in Permanent Regulatory Takings

When a real estate parcel has been permanently affected by a regulatory taking, the measure of economic injury is the difference between the fair market value of the property, without the restriction imposed by the government action, and the fair market value of the property, with the restriction imposed by the government action, both measured at the time of the taking. See, e.g., Forest Props., Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir. 1999) (citing Loveladies Harbor, 28 F.3d at 1178, 1182; Fla. Rock Indus., Inc. v. United States, 18 F.3d 1560, 1567 (Fed. Cir. 1994)). There does not appear to be any real dispute that the fair market value of income-producing property reflects and includes the value of income that might be realized from the property. See,

e.g., First Fed. Lincoln Bank v. United States, 518 F.3d 1308, 1317 (Fed. Cir. 2008)
("The market value of income-generating property reflects the market's estimate of the
present value of the chance to earn future income, discounted by the market's view of the
lower future value of the income and the uncertainty of the occurrence and amount of any
future property.") (citations omitted); Cane Tenn., Inc. v. United States, 71 Fed. Cl. 432,
438 (2005) (discussing fair market value determination based upon the income-
generating potential of the property) (citations omitted), aff'd, 214 F. App'x 978 (Fed.
Cir. 2007) (table).  Thus, the standard approach for measuring economic injury, the
difference in fair market value without and with the government restriction, is applicable
to alleged permanent regulatory takings affecting income-producing real property, just as
it applies to alleged permanent takings of other real property.  See A.A. Profiles, Inc. v.
City of Fort Lauderdale, 253 F.3d 576, 584 (11th Cir. 2001) (reversing the trial court's
methodology which relied on a "market rate return" approach, and stating that for a
permanent regulatory taking, the "diminution in market value test" is proper); see also
MHC Fin. Ltd. P'ship v. City of San Rafael, 714 F.3d 1118, 1127 (9th Cir. 2013) (MHC
Financing) (stating that the trial court should have used a figure representing the
diminution in the value of the property to assess the economic impact of a regulation on a
mobile home park).

> 2.      Three Types of Plaintiffs Affected by the Preservation Statutes

Three relevant types of plaintiffs have litigated takings claims based on the
enactment of the Preservation Statutes.  The first category consists of owners who
retained possession of their properties and whose mortgage prepayment rights were
restored, in some fashion, by the passage of the Hope Act.  These plaintiffs neither
entered into a LIHPRHA sale, nor entered into a LIHPRHA use agreement.  None of the
FWPs fall into this category, although four of the plaintiffs in Cienega X were in this
category.  503 F.3d at 1287 n.20.  For want of a better term, the court describes these
litigants as Hope Act plaintiffs, because the passage of the Hope Act signaled the end of
the alleged temporary regulatory takings period.  See id. at 1287-88 & n.20 (emphasizing
that the duration of the legislative restriction, which ended as a result of the enactment of
the Hope Act, was an essential fact for the takings analysis applicable to these plaintiffs).

The second category of owners are those who, before the passage of the Hope Act,
entered into LIHPRHA use agreements with HUD "to stay in the [low-income housing]
program," through which they exchanged any vestige of the original mortgage
prepayment right for significant benefits in their ongoing relationship with HUD.
Cienega X, 503 F.3d at 1273 & n.4.  Only one of the FWPs, Rock Creek Terrace L.P.
(Rock Creek), signed a LIHPRHA use agreement and is in this category of plaintiff.
Four of the Cienega X plaintiffs were in this category.  503 F.3d at 1273 n.5, 1279 n.12,
1288.  The court refers to these litigants as LIHPRHA use agreement plaintiffs.

The third category of owners sold their properties either before the Hope Act was
in effect, or arranged the sale before the Hope Act was in effect and completed the sale

shortly thereafter.  All of these sales were LIHPRHA sales, in conformance with the requirements of LIHPRHA.  Five of the FWPs in this suit, every FWP except Rock Creek, are in this category.  None of the <u>Cienega X</u> plaintiffs were in this category.  The court refers to these litigants as LIHPRHA sale plaintiffs.

Before delving into relevant precedent, the court provides some general comments regarding the three categories of plaintiffs and the significance of those categories.  Much of the commentary in <u>Cienega X</u> appears to be directed to a temporary regulatory takings analysis, which is logical because the Hope Act plaintiffs in that appeal are emblematic of property owners whose property right was temporarily extinguished by one governmental action, then restored by another governmental action, nineteen to twenty-seven months later.  503 F.3d at 1287-88 & n.20.  None of the FWPs here are in the category of the Hope Act plaintiffs; thus, the FWPs cannot benefit from any portions of <u>Cienega X</u> which are directed to the situation of the Hope Act plaintiffs.

Similarly, aside from Rock Creek, none of the FWPs are in the second category of LIHPRHA use agreement plaintiffs, which is the only other type of plaintiff before the Federal Circuit in <u>Cienega X</u>.  For the LIHPRHA sale plaintiffs here, five of the FWPs, <u>Cienega X</u> did not address their situation, and the court must look to other precedent for guidance.  More specifically, for the LIHPRHA sale plaintiffs, the court must determine whether the owner's sale of the property, while a government restriction is still in effect, signifies that the alleged taking should be considered to be permanent in nature.

Finally, the court notes a similarity between the second and third categories of plaintiffs, the categories which encompass all six FWPs in this case.  In each instance, the plaintiff disposed of any vestige of the original mortgage prepayment right, pursuant to LIHPRHA procedures, either through a LIHPRHA use agreement or a LIHPRHA sale.  Through that action which took place, or was put in place, before the Hope Act took effect, the plaintiff no longer retained an attenuated version of the original prepayment right, and that property right for the owner was permanently extinguished.  Conceptually, at least, the fact that these plaintiffs' prepayment rights were permanently extinguished is a strong indication that any alleged regulatory taking here was permanent, not temporary.

The court begins its analysis by examining the trial court's decision in <u>Cienega Gardens v. United States</u>, 67 Fed. Cl. 434 (2005) (<u>Cienega IX</u>), <u>vacated</u>, 503 F.3d 1266 (Fed. Cir. 2007).

3.      <u>Cienega IX</u>

There is no doubt that the trial court in <u>Cienega IX</u> viewed the alleged takings in that case (for the eight plaintiffs that would also be the subject of <u>Cienega X</u>), as temporary regulatory takings.  <u>Cienega IX</u>, 67 Fed. Cl. at 437-38.  The trial court relied, at least in part, on the characterization in the <u>Cienega VIII</u> opinion of the takings alleged by the four "Model Plaintiffs."  <u>Id.</u> at 437 (citing <u>Cienega VIII</u>, 331 F.3d at 1353-54).

12

The trial court in <u>Cienega IX</u> noted that the four Model Plaintiffs had recently been awarded just compensation, and that their awards were on appeal before the Federal Circuit.  <u>Id.</u> at 437 n.1.  Those appeals resulted in two Federal Circuit decisions, <u>Independence Park Apartments v. United States</u>, 449 F.3d 1235 (Fed. Cir.) (<u>Independence Park I</u>), <u>decision clarified on reh'g</u>, 465 F.3d 1308 (Fed. Cir. 2006), and <u>Independence Park Apartments v. United States</u>, 465 F.3d 1308 (Fed. Cir. 2006) (<u>Independence Park II</u>).

<u>Cienega IX</u> was vacated by the Federal Circuit, and the suit was remanded for a "new <u>Penn Central</u> analysis under the correct legal standard."  <u>Cienega X</u>, 503 F.3d at 1291.  Thus, <u>Cienega IX</u> cannot guide the court here.

The court turns next to <u>Independence Park I</u> and <u>Independence Park II</u>.

### 4.     <u>Independence Park I</u> and <u>Independence Park II</u>

The most relevant portion of <u>Independence Park I</u> concerns two LIHPRHA use agreement plaintiffs, Sherman Park Apartments (Sherman Park) and St. Andrews Gardens (St. Andrews).  449 F.3d at 1246-48.  According to the Federal Circuit, the holdings in <u>Cienega VIII</u> did not specifically address the particular circumstances of Sherman Park and St. Andrews:

> [A]t no point in [<u>Cienega VIII</u>] did we discuss the [LIHPRHA] use agreements or their effect on the plaintiffs' legal rights in this case.  The statements on which the trial court relied consisted mainly of characterizations of the facts as applied generally to all 42 plaintiffs.  We did not focus on the specific situation of Sherman Park and St. Andrews, nor did we suggest that their entry into use agreements before the enactment of the HOPE Act had no legal effect.  The mandate in <u>Cienega VIII</u> therefore does not foreclose the plaintiffs' cross-appeal.  Accordingly, we turn to the merits of the parties' arguments regarding the legal effect of the [LIHPRHA] use agreements.

<u>Independence Park I</u>, 449 F.3d at 1246-47.  Thus, it is clear that the <u>Independence Park I</u> panel viewed the takings claims of the LIHPRHA use agreement plaintiffs in that case to be open to an analysis that differed from the takings analysis discussed in <u>Cienega VIII</u>.

According to the Federal Circuit, the legal effect of a LIHPRHA use agreement is "better characterized as an offer by the government of something of value to offset the prepayment rights taken by statute."  <u>Independence Park I</u>, 449 F.3d at 1247.  Indeed, the enactment of the Hope Act was immaterial in light of the extinguishment of the original prepayment right by the plaintiffs' execution of the LIHPRHA use agreements:  "Once the plaintiffs had signed the use agreements, however, the passage of the HOPE Act was irrelevant to them."  <u>Id.</u>  Thus, according to <u>Independence Park I</u>, the date of the

enactment of the Hope Act, which is a key fact in the takings claims of Hope Act plaintiffs, see Cienega X, 503 F.3d at 1287-88 & n.20, is of absolutely no consequence in the takings claims of LIHPRHA use agreement plaintiffs.

How, then, is a court to measure the economic impact of the alleged takings of LIHPRHA use agreement plaintiffs? Independence Park I provides the initial answer to that question:

> This situation is analogous to a physical taking in which the government appropriates a plaintiff's property at the outset and then takes steps to mitigate the financial impact of the taking, rather than returning the property to the plaintiff. In such a case, the proper analysis is to treat the initial taking as permanent and to calculate the damages for the taking by starting with the amount that the plaintiff lost as a result of the initial taking and subtracting from that sum the amount by which the plaintiff was made better off by the steps taken by the government to offset the impact of the taking. See, e.g., Shelden v. United States, 7 F.3d 1022, 1031 (Fed. Cir. 1993).

449 F.3d at 1247 (emphasis added).

Put in simpler terms, the alleged taking is permanent in nature and the economic impact of the alleged taking is measured in two steps. First, the court determines the difference in the fair market value of the property, without and with the restriction, both measured at the time of the taking. See, e.g., Colony Cove Props., LLC v. City of Carson, 888 F.3d 445, 451 (9th Cir. 2018) ("[E]conomic impact is determined by comparing the total value of the affected property before and after the government action. Projected income streams can contribute to a method for determining the post-deprivation value of property, but the severity of the loss can be determined only by comparing the post-deprivation value to pre-deprivation value." (citing MHC Financing, 714 F.3d at 1127)). Second, the court adjusts that value by deducting the monetary value of the benefits to the plaintiff flowing from the LIHPRHA use agreement. Independence Park I, 449 F.3d at 1247. No clearer blueprint is required for the determination of the economic impact of the regulatory takings claims asserted by LIHPRHA use agreement plaintiffs.

If there were any doubt as to the proper takings analysis for LIHPRHA use agreement plaintiffs, Independence Park II responded to the government's challenge to this portion of the holdings in Independence Park I. Independence Park II, 465 F.3d at 1309-10. Once again, the Federal Circuit held that the passage of the Hope Act was irrelevant to the claims of LIHPRHA use agreement plaintiffs. Id. at 1310. Once again, the Federal Circuit described the situation as a permanent taking, where the first step of the analysis was determining the loss in property value caused by the enactment of the Preservation Statutes:

A person valuing the amount taken at the time those statutes were enacted would consider the taking permanent and make the valuation determination on that basis.

Id. at 1311 (citing Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 474 (1973)).  And, once again, the Federal Circuit reiterated its commitment to a two-step permanent regulatory takings analysis of the economic impact on LIHPRHA use agreement plaintiffs:

We therefore reiterate that the proper method for assessing the damages suffered by St. Andrews and Sherman Park is to start with the damages that would have been assessed for a permanent taking and to reduce that amount by the value of the benefits conferred on St. Andrews and Sherman Park by the use agreements, as determined at the time they entered into the agreements.

Id. at 1312.

After considering the holdings in Independence Park I and Independence Park II, the court concludes that a permanent takings analysis of economic injury, not a temporary takings analysis of economic injury, is appropriate for LIHPRHA use agreement plaintiffs.  In this case, the Independence Park I and Independence Park II analysis is directly applicable to the claims of Rock Creek, and its evidence of economic injury must allow the court to first determine the difference in fair market value caused by the Preservation Statutes, and then, in a second step, to determine the reduction to that loss derived from the benefits afforded to Rock Creek by the LIHPRHA use agreement.

The court notes that the Independence Park II decision relied upon a seminal takings case, First English Evangelical Lutheran Church of Glendale v. Los Angeles County, California, 482 U.S. 304 (1987) (First English).  First English is cited for this proposition:

When subsequent action converts an otherwise permanent taking into a temporary one, just compensation is typically calculated in the same manner, adjusted to account for the subsequent events so that the damages will accurately reflect the value of what was taken.

Independence Park II, 465 F.3d at 1311 (citing First English, 482 U.S. at 321; Yuba Nat. Res., Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990)).  The "subsequent action" cutting short the permanent taking in Independence Park II was the "act of entering into the use agreements" by Sherman Park and St. Andrews.  Id. at 1312. Although First English specifically addressed subsequent government action that might cut short the alleged taking, 482 U.S. at 321, Independence Park II extends the analysis in First English to a situation where it is the landowner's action that cuts short the taking.

Because LIHPRHA sale plaintiffs are in the same posture as LIHPRHA use agreement plaintiffs, having extinguished any vestige of their original prepayment rights by entering into LIHPRHA sale agreements (in lieu of LIHPRHA use agreements), the analytical framework provided by <u>Independence Park I</u> and <u>Independence Park II</u> also provides the proper measure of the economic impact of the Preservation Statutes on these plaintiffs.  The only real difference between these two categories of plaintiffs, as to the method for determining economic injury, is the deduction made to adjust the permanent effect of LIHPRHA on the property's fair market value.  In the case of the LIHPRHA use agreement plaintiffs, it is the deduction for the benefits derived from the use agreements, measured at the time the use agreements were signed.  For the LIHPRHA sale plaintiffs, it is the deduction for the amount realized from the sale of the subject property, measured at the time of the sale.

The court now turns to <u>Cienega X</u>, to determine whether any portion of that opinion directly contradicts the guidance given by <u>Independence Park I</u> and <u>Independence Park II</u>.

> 5.     <u>Cienega X</u>

Certainly, the <u>Cienega X</u> panel was aware of the holdings in <u>Independence Park I</u> and that the situation of LIHPRHA use agreement plaintiffs was addressed in that opinion, because the precedential holdings in <u>Independence Park I</u> are cited twice by the <u>Cienega X</u> panel.  <u>See</u> <u>Cienega X</u>, 503 F.3d at 1273 n.5, 1284 n.14.  The primary focus in <u>Cienega X</u> appears to be on Hope Act plaintiffs, or on more general pronouncements that might apply both to Hope Act plaintiffs and LIHPRHA use agreement plaintiffs.  <u>See</u> <u>id.</u> at 1273 (stating that "<u>only</u> four of the plaintiffs entered into [LIHPRHA] use agreements after ELIHPA expired but during the period that LIHPRHA was in effect") (emphasis added).  There is very little discussion in <u>Cienega X</u> of the legal effects particular to the execution of a LIHPRHA use agreement, and how that fact should be incorporated in the analysis of the economic injury suffered by the plaintiff.

Generally, there is ambiguity as to whether certain sections of the <u>Cienega X</u> opinion apply specifically to Hope Act plaintiffs, LIHPRHA use agreement plaintiffs, or both.  The court begins with the least ambiguous, relevant portions of <u>Cienega X</u>.  There is one passage which echoes the <u>Independence Park I</u> and <u>Independence Park II</u> decisions, in that it discusses the need to deduct, or "offset," benefits offered the plaintiffs by LIHPRHA.  <u>Cienega X</u>, 503 F.3d at 1282-83.  Offsetting in the specific case of LIHPRHA use agreement plaintiffs was addressed in detail.  <u>Id.</u> at 1285-87.

Somewhat less clearly, but still echoing <u>Independence Park I</u> and <u>Independence Park II</u>, the <u>Cienega X</u> panel noted in the "Duration" section of the opinion that LIHPRHA use agreement plaintiffs were different from Hope Act plaintiffs.  The passage noting that difference is very generally worded:

> Four of the owners elected to enter into use agreements after the enactment
> of LIHPRHA but before the HOPE enactment:  Cienega Gardens, Del Amo
> Gardens, Las Lomas Gardens, and Chancellor Manor.  The <u>temporary</u> nature
> of the legislation is <u>irrelevant</u> with respect to those who had use agreements
> in place when HOPE was enacted since those owners acted reasonably on
> the assumption that the restrictions were <u>permanent</u>.

<u>Cienega X</u>, 503 F.3d at 1288 (emphasis added).  This statement can reasonably be read to
endorse a permanent takings analysis for the LIHPRHA use agreement plaintiffs, as was
set forth in <u>Independence Park I</u> and <u>Independence Park II</u>.  The "Duration" section of the
opinion also appears to indicate that the passage of the Hope Act is of great significance
to the claims of Hope Act plaintiffs, and irrelevant to the claims of LIHPRHA use
agreement plaintiffs.  <u>Cienega X</u>, 503 F.3d at 1287-88 & n.20.  This is perfectly
consonant with the analysis set forth in <u>Independence Park I</u> and <u>Independence Park II</u>.

   The court notes, too, that the phrases "temporary taking" or "temporary regulatory
taking," occur only a few times in <u>Cienega X</u>, including twice in the dissent.  <u>See</u> 503
F.3d at 1292-93 (Newman, J., dissenting).  In other instances, the phrases are used to
describe prior history of the case.  <u>Id.</u> at 1275 (citing <u>Cienega VIII</u>, 331 F.3d at 1324),
1277 (citing <u>Cienega IX</u>, 67 Fed. Cl. at 438).  The most substantive use of the temporary
takings phraseology occurs in the "Parcel as a Whole" section of the opinion, which
addressed some aspects of the <u>Cienega IX</u> court's flawed measurement of economic
injury in its <u>Penn Central</u> analysis.  <u>Cienega X</u>, 503 F.3d at 1281-82.

   The court has considered each occurrence of "temporary taking" phraseology in
this section of <u>Cienega X</u>.  The court concludes that the Federal Circuit's analysis broadly
describes the applicability of a temporary regulatory takings analysis to at least some of
the plaintiffs in that case, which, as noted above, included both Hope Act plaintiffs and
LIHPRHA use agreement plaintiffs.  This opinion section <u>does not</u> clearly state that all of
the takings in that case were temporary in nature.  Nor, it must be acknowledged, does
this section of the <u>Cienega X</u> opinion state that <u>only</u> the Hope Act plaintiffs' alleged
takings were temporary in nature.[9]  Finding no conflict in <u>Cienega X</u> with the guidance

---

[9]   At the end of the "Parcel as a Whole" section of <u>Cienega X</u>, a LIHPRHA use
agreement plaintiff, Chancellor Manor, is mentioned in a footnote.  503 F.3d at 1282
n.13.  The Federal Circuit noted that the economic impact of the Preservation Statutes on
Chancellor Manor, as determined by the trial court, was obviously flawed because that
impact was significantly greater than the assessed value of the property.  <u>Id.</u> (citing
<u>Cienega IX</u>, 67 Fed. Cl. at 477 n.54).  The court does not construe this footnote in
<u>Cienega X</u> to be an indication that the Federal Circuit considered Chancellor Manor to
have been subject to a temporary regulatory taking.  Instead, the <u>Cienega X</u> panel appears
to have pointed to Chancellor Manor as an illustrative example of how the trial court had
erred in its economic impact analysis, in general.

provided by Independence Park I and Independence Park II, the court must follow the takings analysis set forth in those earlier Federal Circuit decisions for both the LIHPRHA use agreement plaintiff among the FWPs, i.e., Rock Creek, and for the LIHPRHA sale plaintiffs, the other five FWPs.

Finally, the Cienega X opinion puts to rest any concerns that the analytical framework provided by Independence Park I and Independence Park II, elaborated in the just compensation context, is inapplicable to the economic injury prong of the Penn Central analysis required in takings cases based on the Preservation Statutes.  The text of the opinion includes this statement:  "The [offsetting] benefits [provided by the Preservation Statutes] must be considered as part of the [Penn Central] takings analysis." Cienega X, 503 F.3d at 1283-84.  In the accompanying footnote, the Cienega X panel explained why the reasoning of Independence Park I was of value for both the just compensation inquiry and the economic impact inquiry:

> Such [offsetting] benefits, of course, would be pertinent as well to a just compensation analysis if a taking had occurred.  In Cienega VIII, we held that a taking had occurred with respect to the model plaintiffs (two of which had entered into use agreements under LIHPRHA—Sherman Park and St. Andrews), and directed the Court of Federal Claims to enter the damages awarded in Cienega [Gardens v. United States], 38 Fed. Cl. 64 [(1997) (subsequent history omitted)].  See Cienega VIII, 331 F.3d at 1353.  On remand, the Court of Federal Claims reinstated the damages award for the model plaintiffs, and we reviewed that award in Independence Park Apartments v. United States, 449 F.3d 1235 (Fed. Cir. 2006) [(Independence Park I)].   There we stated that, for purposes of determining just compensation, "the calculation of damages should be adjusted [for the two model plaintiffs that entered into use agreements] to treat the ban on prepayment as lasting as long as the use agreements provided for, with the amount of the damages adjusted to account for any benefits . . . obtained as a result of the use agreements."  Id. at 1248.  However, the Independence Park [I] decision does not suggest that these benefits should not also be considered as part of the takings analysis.

Cienega X, 503 F.3d at 1284 n.14; see also CCA Associates II, 667 F.3d at 1251 (noting that offsetting benefits in LIHPRHA cases are counted in both the just compensation calculation, as well as in the Penn Central analysis) (citing Cienega X, 503 F.3d at 1283-84).  Thus, although not every just compensation analysis is germane to the economic injury prong in a Penn Central inquiry, see Cienega X at 1281-82

(distinguishing <u>Kimball Laundry Co. v. United States</u>, 338 U.S. 1 (1949)), the analytical framework in <u>Independence Park I</u> was specifically endorsed for that purpose.[10]

> 6.    Summary of Precedent

Having reviewed the precedent most relevant to the takings claims of LIHPRHA use agreement plaintiffs and LIHPRHA sale plaintiffs, the court concludes that <u>Independence Park I</u> and <u>Independence Park II</u> provide the analytical framework for these regulatory takings claims.  Applying this precedent, the FWPs' claims are in the nature of permanent takings claims.  To determine the economic injury, if any, suffered by these plaintiffs, the first step is to determine the difference in fair market value caused by the Preservation Statutes.  This is accomplished by comparing the subject property's fair market value, as enhanced by the mortgage prepayment right, to the property's fair market value, deprived of the mortgage prepayment right, both measured at the time of the taking.

The second step is to deduct from the sum achieved in the first step the benefits LIHPRHA provided the FWPs.  In the case of Rock Creek, those benefits arise from the LIHPRHA use agreement.  For the remaining FWPs, those benefits derive from the proceeds of the LIHPRHA sale to the new owner of the subject property.  These two calculations determine the actual economic impact of the Preservation Statutes on these plaintiffs.

A third and final step, if economic loss has been shown, would be to determine whether the plaintiff's economic loss was severe enough to support a taking under <u>Penn Central</u>.  Neither <u>Cienega X</u>, 503 F.3d at 1280-82, nor the decisions in <u>Independence Park I</u> and <u>Independence Park II</u>, offer definitive guidance as to this final step in the analysis for the categories of plaintiffs in this case.  At a minimum, however, it is clear that "return on equity" measures cannot be used, because that particular metric does not address the value of the parcel as a whole.  <u>See</u> <u>Cienega X</u>, 503 F.3d at 1280-81 (citing <u>Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.</u>, 508 U.S. 602, 643-44 (1993)).  The court need not opine as to the precise contours of the severity framework applicable to the FWPs, because their evidence is insufficient to perform even the first step of the economic impact analysis, <u>i.e.</u>, the comparison of the fair market

---

[10]    As the Supreme Court has commented, "just compensation for a net loss of zero is zero."  <u>Brown v. Legal Found. of Wash.</u>, 538 U.S. 216, 240 n.11 (2003).  Just compensation is therefore related, logically, to the economic injury determined in a <u>Penn Central</u> inquiry.  <u>Cf.</u> <u>Love Terminal Partners, L.P. v. United States</u>, 889 F.3d 1331, 1343 n.2 (Fed. Cir. 2018) (noting that expert testimony on the topic of economic loss may employ assumptions that are similar to those in expert testimony regarding just compensation).

values for each property, with and without the mortgage prepayment right, measured at the time of the alleged taking.

Having laid the foundation for the Penn Central analysis of the permanent regulatory takings alleged by the FWPs, the court now turns to the application of the three Penn Central factors to the evidence proffered by plaintiffs. The question before the court is whether plaintiffs have adduced sufficient evidence to survive defendant's motion for summary judgment. As noted earlier in this opinion, "[a] nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power, 16 F.3d at 1202 (citing Celotex, 477 U.S. at 323).

C.    The Penn Central Factors

1.    The Character of the Governmental Action

The character of the governmental action factor of the Penn Central test, as applied to the Preservation Statues, has been addressed by the Federal Circuit. Plaintiffs argue, and the court must agree, that the character of the governmental action factor weighs in favor of a finding that a taking was effected by the Preservation Statutes vis-à-vis the FWPs. See, e.g., Cienega VIII, 331 F.3d at 1340 ("We conclude, as matter of law, that the government's actions in enacting ELIHPA and LIHPRHA, insofar as they abrogated the Model Plaintiffs' contractual rights to prepay their mortgages and thereby exit the housing programs, had a character that supports a holding of a compensable taking.").

Defendant acknowledges that the character of the governmental action factor weighs in the FWPs' favor. ECF No. 459 at 9. Plaintiffs contend that the weight of the character of the governmental action factor is sufficient, "on its own," to deny the government's summary judgment motion. ECF No. 439 at 15. Defendant disagrees, citing CCA Associates II, 667 F.3d at 1248. ECF No. 459 at 9. Defendant's position is correct.

Plaintiffs' burden at trial would be to put forth sufficient evidence on all three Penn Central factors to establish a taking. See CCA Associates II, 667 F.3d at 1245 (stating that "the plaintiff has the burden to prove a taking occurred"). Insufficient evidence on the economic impact (or economic injury) factor and the investment-backed expectations factor defeats a takings claim, even if the character of the governmental action factor weighs heavily in favor of the claimant. See id. at 1248 (holding that because the investment-backed expectations and the economic injury factors weighed against the finding of a taking, the character of the governmental action factor was not dispositive). Summary judgment for the government is not precluded by plaintiffs' strong showing on the character of the governmental action factor.

Following <u>CCA Associates II</u> and the other authorities cited by defendant, ECF No. 459 at 9-12, the court must consider whether the FWPs could prevail at trial when the court considers their evidence as to economic injury and investment-backed expectations. As plaintiffs oppose defendant's motion for summary judgment, the sufficiency of their evidence on these two factors is determinative of the outcome. <u>Anderson</u>, 477 U.S. at 249. The court therefore finds plaintiffs' reliance on the character of the governmental action factor, as a full and effective bar to summary judgment in favor of the government, to be unavailing, and now turns to the other <u>Penn Central</u> factors.

2.    Distinct Investment-Backed Expectations

According to the government, the FWPs have failed to point to sufficient evidence on the investment-backed expectations factor to withstand summary judgment in favor of the government on their takings claims. ECF No. 422 at 12. The court cannot agree (except as to 620 Su Casa Por Cortez, <u>see</u> <u>supra</u>).

The evidence of the five remaining FWPs as to their investment-backed expectations is not deficient, when seen through the summary judgment lens, despite defendant's protestations to the contrary. The government contends that plaintiffs have failed to identify a genuine dispute of material fact as to the FWPs' investment-backed expectations. <u>See</u> ECF No. 422 at 12 ("The Court should grant summary judgment because there is no genuine dispute that plaintiffs cannot satisfy their burden under the controlling standard for the investment-backed expectations prong–namely, reasonable expectations at the time of investment.") (citing <u>Cienega X</u>, 503 F.3d at 1288). Defendant argues, and plaintiffs do not disagree, that investment-backed expectations are measured at the time the investment was made, and according to objective, industry standards for reasonableness. <u>Id.</u>

Applying this standard, defendant argues that plaintiffs' evidence falls short. In the government's opening brief, the focus is mostly on plaintiffs' expert, Dr. William Wade. <u>Id.</u> at 13-14. In defendant's reply brief, the critique encompasses a broader range of plaintiffs' evidence of investment-backed expectations. ECF No. 459 at 13-16. According to defendant, "[w]ithout objective evidence of the industry's investment backed expectations at the time of the plaintiffs' investment, plaintiffs have failed to make a sufficient showing on an essential element of their claim, and the Court should grant summary judgment in favor of the Government." ECF No. 422 at 14.

At this point in the litigation of plaintiffs' claims, the court does not evaluate the evidence to determine whether plaintiffs have met their ultimate burden of proof on the investment-backed expectations prong of the <u>Penn Central</u> inquiry. Instead, the court is tasked with reviewing plaintiffs' evidence to see if they <u>could</u> win on this prong. <u>Anderson</u>, 477 U.S. at 249. The court credits not Dr. Wade, <u>see</u> <u>infra</u>, but the "body of evidence" compiled by plaintiffs, ECF No. 439 at 30, largely derived from the testimony of the investors, developers and syndicators who were involved in the development of the

properties at issue in these consolidated cases. Although defendant urges the court to reject much of this evidence as "self-serving," and "subjective," not "objective," ECF No. 459 at 7, 13-14, plaintiffs' evidence is sufficient to establish a genuine dispute of material fact as to the reasonableness of the FWPs' investment-backed expectations, measured objectively, by industry standards, at the time the investments were made.

Defendant relies heavily on CCA Associates II. Id. at 13-14 & n.3. While the discussion of the objective evidence of investment-backed expectations in CCA Associates II is instructive, the court cannot conclude, as defendant urges, that the Federal Circuit described therein a rigid scheme for distinguishing subjective from objective evidence in every takings case based on the passage of the Preservation Statutes. The Federal Circuit noted, first, that different facts may yield different outcomes on this prong. See CCA Associates II, 667 F.3d at 1247 ("Cienega X, however, does not suggest that there can only be one objectively reasonable investment strategy for the industry, and we hold that there can potentially be multiple objectively reasonable investment strategies dictated by geography, economics, or other factors."). The Federal Circuit then proceeded to examine the specific evidence of record in that case, and in particular the evidence relied upon by the trial court, and found that the plaintiffs had not met their burden, after a trial, on the reasonable investment-backed expectations prong. Id. at 1247-48. After careful review of the passage in CCA Associates II relied upon by defendant, the court concludes that the types of evidence which may establish objective measures of investment-backed expectations are not necessarily limited to the specific examples of evidence discussed in CCA Associates II.

Plaintiffs rely on the evidence provided in a number of depositions of the investors, developers and syndicators of the FWPs' housing complexes and similar properties. See generally ECF Nos. 441-1 through 441-4. Plaintiffs note, generally, that these deponents have broad experience in the real estate market, and have participated in a number of organizations which broadly represent the real estate investment sector of the American economy. ECF No. 439 at 30-34; ECF No. 440 at 29-38.

Further, the court notes that the Federal Circuit has expressed a preference for contemporaneous documentation relevant to the investment-backed expectations factor. Cienega X, 503 F.3d at 1290-91. For the reasonable investment-backed expectations factor, plaintiffs also rely on contemporaneous documentation, at least some of which has probative value. ECF No. 439 at 31-32, 34; ECF No. 440 at 10-11, 34-35; ECF No. 441-1 at 34-215; ECF No. 441-3 at 711-21. The court concludes that the five remaining FWPs have pointed to enough testimony and contemporaneous documentation that they might meet their burden of proof on the investment-backed expectations factor at trial.

As the Federal Circuit has stated, takings cases are fact-intensive and should not be hastily dismissed on summary judgment. Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (citing Yuba Goldfields, Inc. v. United States, 723 F.2d 884, 887 (Fed. Cir. 1983)). Viewing plaintiffs' evidence in the light most favorable to the FWPs,

and according all favorable inferences to this evidence, the court views plaintiffs' deposition and documentary evidence as probative of the reasonable investment-backed expectations factor, and sufficient to withstand defendant's motion for summary judgment on this factor.  Dairyland Power, 16 F.3d at 1202.  In other words, plaintiffs' evidence on the reasonable investment-backed expectations factor is sufficient to create a genuine dispute of material fact as to this factor.[11]

3.   Economic Injury

According to the government, five of the FWPs, those that sold their properties using LIHPRHA procedures, have failed to point to sufficient evidence on the economic impact (or economic injury) factor to withstand summary judgment in favor of the government on their takings claims.  ECF No. 422 at 17-18.  The sixth FWP, Rock Creek, the only FWP to enter into a LIHPRHA use agreement, is also alleged to have "not suffered any economic injury."  Id. at 18 (citations omitted).  The court agrees with defendant that summary judgment is merited because the FWPs have not pointed to evidence sufficient to prevail on the economic impact prong of the Penn Central analysis.

As a threshold matter, the court considers whether summary judgment is available based solely on an insufficiency of evidence of economic impact in a regulatory takings case.  Plaintiffs argue that the government cannot prevail on summary judgment even if plaintiffs have not mustered sufficient evidence of economic impact.  See ECF No. 439 at 15 ("Application of Hodel and Kaiser precludes summary judgment based solely on the distinct investment backed expectations or economic injury factors of Penn Central in this case.").  Defendant points out that the Federal Circuit has not embraced plaintiffs' reading of Hodel and Kaiser, ECF No. 459 at 9-10 & n.1, and as stated supra, the court has found that Hodel and Kaiser are inapposite to the takings claims in this case.

Defendant argues, further, that a regulatory takings claim cannot survive summary judgment if the plaintiff fails to point to sufficient evidence of economic injury.  Id. at 10 (citing Seiber v. United States, 364 F.3d 1356, 1370 (Fed. Cir. 2004); Hendler v. United States, 175 F.3d 1374, 1385 (Fed. Cir. 1999)).  The court agrees with defendant.  In light of the binding precedent cited by the parties, the court must consider whether the FWPs' takings claims fail for lack of evidence of economic injury.

Defendant raises a number of challenges to the sufficiency of plaintiffs' evidence of economic injury.  The court addresses only two of these challenges, because they are dispositive.  The government correctly asserts that plaintiffs have not established the fair

---

[11]      Defendant contends that plaintiffs' expert does not proffer probative evidence of reasonable investment-backed expectations.  ECF No. 422 at 13-14; ECF No. 459 at 16-17.  The court does not reach this argument, because plaintiffs' other evidence is sufficient to withstand summary judgment as to this Penn Central factor.

market value of the FWPs' properties at the time of the alleged taking. ECF No. 422 at 17. The government also asserts that the testimony of plaintiffs' expert Dr. William Wade cannot establish economic injury because his methodology is "flatly inconsistent with controlling precedent." Id. at 20. This contention is also true, although the court's analysis and defendant's analysis diverge in many respects.

The court notes, at the outset, that plaintiffs' only evidence of economic injury is founded on the methodology of Dr. Wade. See First-Wave Plaintiffs' Pretrial Memorandum, ECF No. 438 at 69-71, 83-84, 97. Plaintiffs submitted two expert reports authored by Dr. Wade in support of their opposition to the government's summary judgment motion. See ECF No. 441-4 at 4-318. After conducting an extensive review of those reports, the court agrees with the government that plaintiffs have not established the fair market value (FMV) of the FWPs' properties at the time of the taking, for either the scenario where the mortgage prepayment right was unrestricted, or the scenario where the mortgage prepayment right was restricted by LIHPRHA. The court also finds that Dr. Wade's methodology is unsound because it is inconsistent with binding precedent.

The court divides its analysis into three sections. First, the court examines Dr. Wade's general approach to the economic injury analysis. Second, the court reviews Dr. Wade's conclusions as to the economic injury suffered by Chauncy House Company (Chauncy House). The court chooses Chauncy House as a representative LIHPRHA sale plaintiff because its economic injury, as calculated by Dr. Wade, is in the middle of the range of economic injury for the FWPs ($5,106,883, in a range of $2,055,488 to $9,814,429). ECF No. 441-4 at 12. The final section devoted to Dr. Wade's findings concerns plaintiff Rock Creek, the only LIHPRHA use agreement plaintiff among the FWPs.

a.    Dr. Wade's Methodology, in General

Dr. Wade disavows the value of any economic injury calculation relying on a comparison of the FMVs of the subject property at the time of the taking, where one FMV includes the mortgage prepayment right, and the other excludes that mortgage prepayment right. He sometimes refers to this approach, which he shuns in his reports, as the "change in property values" approach, ECF No. 441-4 at 214, or the "difference in property values" approach, id. at 217, but his short-hand reference for this approach is the "diminution in value" method, or, simply, the DIV method, id. at 224-25. Dr. Wade's rejection of the DIV method is categorical, complete and unwavering. See id. at 11, 28-29 (showing Dr. Wade's economic injury formulas, which do not compare FMVs); id. at 31 (noting Dr. Wade's reliance on a "Net Present Value," which is distinguished from FMV); id. at 214-15, 217, 221, 223, 243, 251, 257, 291-96, 300, 317 (rejecting the government experts' reliance on the DIV method); see also id. at 28 n.13 (acknowledging that Cienega X, 503 F.3d at 1282, specifically endorsed the "'change in value'" approach as a valid test for determining economic loss in LIHPRHA takings cases, but contending,

paradoxically, that the DIV method is appropriate only in "real property" takings cases, not here).

Dr. Wade's expert reports show that he did not use the DIV method. As noted earlier in this opinion, a comparison of the FMVs of the subject properties at the time of the taking, one with and the other without the mortgage prepayment right, is the first step required by Independence Park I and Independence Park II. Dr. Wade did not perform this calculation, and his calculations of economic injury are fundamentally flawed as a result.

Not only did Dr. Wade fail to perform a comparison of FMVs as the first step in determining economic injury, he does not opine as to the actual and correct FMVs that could be used to perform such a comparison. Dr. Wade's primary use of appraisals of the subject properties in the record is to use these as a "first step." ECF No. 441-4 at 39. Dr. Wade's first step, however, is not analogous to the first step required by Independence Park I and Independence Park II. He uses appraisals performed in accordance with LIHPRHA guidelines in the following manner: "The analysis in this report relies on the resultant [LIHPRHA FMV appraisals] solely as the basis from which to determine what the owners actually received on sale to [a] non-profit, not as a predictor of future income losses." ECF No. 441-4 at 29; see also id. at 300 (same).

Thus, Dr. Wade presents no opinion as to the actual FMVs of the subject properties. Instead, he questions the validity of the LIHPRHA FMV appraisals.[12] See id. at 39 (suggesting that the LIHPRHA FMV appraisal "subtracts conversion [to market rent apartments] costs from an appraiser's estimated FMV"); 298 (stating that the "owners actually did not receive the FMV when transferring their properties to Qualified Buyers [based on LIHPRHA FMV appraisals]).

While there is at least one LIHPRHA FMV appraisal figure for each of the properties in the record, see ECF No. 423 ¶¶ 18, 21, 24, 27, 34, 37, Dr. Wade provides no estimate of the correct pair of FMVs, one for each scenario, for each of the subject properties at the time of the alleged taking. Therefore, even if the court could step into Dr. Wade's shoes and compare FMVs for the subject properties at the time of the alleged taking, a calculation that he refuses to perform, he has not provided the FMV figures that would permit the court to perform even the first step of the economic injury calculation required by Independence Park I and Independence Park II.

---

[12]     The court employs the term LIHPRHA FMV appraisals loosely, to encompass both Transfer Preservation Value and Extension Preservation Value, figures which are derived by following LIHPRHA appraisal guidelines. ECF No. 441-4 at 29 n.14, 298 n.18. These are both measures of FMV, although the accuracy of these FMV measures is disputed by Dr. Wade. Id. at 298-99.

The court concludes that plaintiffs have neither compared FMVs, with or without the mortgage prepayment right, for the subject properties at the time of the alleged taking, nor have they provided the foundation necessary for such a calculation.  Their evidence of economic injury is fatally flawed and is not probative.  Although this flaw is determinative and compels the court to grant defendant's motion for summary judgment as to all of the FWPs, the court has discerned two other significant flaws in plaintiffs' evidence of economic injury which must be noted, one related to the parcel as a whole concept, the other to economic loss severity measures.

As defendant argues, the parcel as a whole focus of the Penn Central inquiry requires that a plaintiff demonstrate economic injury to the entire property, not just to the owner's equity in the parcel.  ECF No. 422 at 20 n.2.  Cienega X is instructive in this regard.  Impact on the owner is measured against the "property as a whole" in both temporary and, as here, permanent takings.  Cienega X, 503 F.3d at 1281.  Only "serious financial consequences," in terms of the property as a whole, will establish a regulatory taking.  Id. at 1282.

The Federal Circuit rejected, in particular, the "return on equity" model employed in Cienega IX because it did not consider the property as a whole.  Id. at 1280-82.  The court noted, in addition, that one of the economic injury findings of the trial court was invalid because the injury calculated by the trial court significantly exceeded the entire assessed value of the property.  Id. at 1282 n.13.  Cienega X held that

> [l]ogically speaking, the government cannot take more than what the plaintiffs actually possess.  A determination that damages exceed the value of the property should be indicative that the method of computing damages is flawed.

Id.

Applying the reasoning of Cienega X in this case, the economic injury of the alleged taking must not be measured against the owner's equity portion of the subject property, but against the parcel as a whole.  Here, Dr. Wade refused to compare FMVs, with or without the mortgage prepayment right, of the entire properties, and instead applied a formula, or formulas, that benchmarked the economic loss to the "owners' equity in the property."  ECF No. 441-4 at 11.  In the court's view, Dr. Wade's approach is inconsistent with the parcel as a whole teaching of Cienega X.

Indeed, it is impossible to imagine how Dr. Wade's economic injury analysis might translate to the parcel as a whole owned by each of the FWPs.  The equity portion of the subject properties, sometimes referred to as the "owner's investment," is fundamental to his calculations.  ECF No. 441-4 at 12, 28, 30, 38-39, 49, 58, 218 & n.8, 253-55, 257-58.  Dr. Wade states that "[s]everity of economic impact must be

benchmarked . . . to the owners' equity at stake to concretely demonstrate the severity of economic impact." Id. at 253. The court disagrees with that statement for two reasons.

First, any benchmarking of the severity of economic injury must be to the parcel as a whole. Cienega X, 503 F.3d at 1280-82. No reasonable reading of Cienega X would substitute the owner's equity portion of the entire property for the parcel as a whole. Second, there is a very real risk, as defendant points out, that benchmarking the severity of economic impact to an equity portion of the entire property inflates, rather than demonstrates, the actual severity of the economic injury under Penn Central. Def.'s Mot. in Limine, ECF No. 452 at 12. The court concludes that Dr. Wade's analysis does not use the correct benchmark for economic injury or the severity of economic impact, which must be the parcel as a whole. In consequence, none of Dr. Wade's conclusions as to economic injury or the severity of economic injury are probative.

Turning now to the severity of economic impact issue, Dr. Wade's "return on equity" approach produces a number of putative indicators of the severity of the FWPs' economic losses, none of which are helpful to the court. In Cienega X, the Federal Circuit disfavored an analytical framework where the economic loss, for one plaintiff, significantly exceeded the appraised value of that plaintiff's entire property. 503 F.3d at 1282 n.13. Here, three of the five LIHPRHA sale plaintiffs are alleged to have suffered economic losses larger than their sale prices, which were established by the LIHPRHA FMV appraisal process. Compare ECF No. 422 at 16, with ECF No. 441-4 at 12. In one instance, for Buckman Gardens L.P., the property was valued at, and sold for, approximately $6,608,000, but Dr. Wade found an economic injury of $9,814,429. ECF No. 422 at 16; ECF No. 441-4 at 12; see also id. at 38 (suggesting that correction of a clerical error would have raised the LIHPRHA FMV appraisal to $6,610,000). In other words, Dr. Wade's analysis suggests that for Buckman Gardens L.P., where the lost prepayment right was worth $9,814,429, and the property's sale price was $6,608,000, the prepayment right's value, alone, exceeded the sale value of the entire property by over $3,000,000. In the court's view, Dr. Wade's methodology is just as illogical as the one criticized in Cienega X. 503 F.3d at 1282 n.13.

There are at least two other measures of the severity of the economic losses of the FWPs presented by Dr. Wade. One is presented in a table titled: "First Wave Plaintiffs' % Reduction in NPV." ECF No. 441-4 at 21, 69, 219. According to Dr. Wade, NPV is "Net Present Value," the present value of certain cash flows from which the owner's equity in the property has been subtracted. Id. at 12. Four of the six properties owned by the FWPs are described by Dr. Wade as having lost more than 100 percent of their NPV as a result of the alleged taking caused by the Preservation Statutes. Id. at 21. This sounds impressive, but there is no obvious way to translate this indicator into the traditional measure provided by a numerator (property value lost) and a denominator (value of the parcel as a whole) that guides this court after Cienega X. See 503 F.3d at 1281 (citing Concrete Pipe, 508 U.S. at 644). In addition, the court notes that this "%

Reduction in NPV" indicator is benchmarked to the equity of each FWP in the property, not to the value of the parcel as a whole, and therefore is not a proper measure of economic severity. See supra.

Another measure of the severity of economic loss is presented by Dr. Wade in a table titled: "First Wave Plaintiffs' Conversion Rate of Return." ECF No. 441-4 at 61. According to Dr. Wade, if the FWPs had been able to convert their properties to market-rate rents at the time of the alleged takings, their investment rates of return would have been much higher than the 9.6% industry threshold for investments. Id. at 60-61. This table posits that the FWPs would have earned between 13.3% and 29.9% per year, absent the enactment of the Preservation Statues. Id. The "Conversion Rate of Return" figures are benchmarked to the owner's equity in the property. Id. at 86, 97, 110, 129, 140, 151. Again, however, this calculation does not compare the value of property lost to the value of the parcel as a whole, and is not probative evidence of the severity of the losses of the FWPs. Cienega X, 503 F.3d at 1280-82.

Dr. Wade's methodology is not probative as to economic injury, or the severity of economic injury. Plaintiffs have not pointed to sufficient evidence of the economic impact of the Preservation Statutes on the FWPs to prevail at trial under Penn Central. The court turns next to the specific application of Dr. Wade's methodology to two representative FWPs—Chauncy House and Rock Creek—to examine his economic loss findings in more detail.

b.    Chauncy House – a LIHPRHA Sale Plaintiff

Dr. Wade finds that Chauncy House experienced an economic loss of $5,106,883. ECF No. 441-4 at 12.  He notes that the LIHPRHA FMV appraisal value for the property was $3,550,000. Id. at 102.  The court observes that if $3,550,000 is indeed an accurate FMV appraisal of Chauncy House, the mere loss of the prepayment right (but not the land, buildings, or income stream from the low-income apartments), is calculated by Dr. Wade to exceed the value of the entire property by approximately $1,500,000.  As applied to Chauncy House, Dr. Wade's methodology could only be justified if he persuasively explained why the LIHPRHA FMV appraisal grossly undervalues Chauncy House.

Dr. Wade does not provide that persuasive explanation in his expert reports. Instead, Dr. Wade relies on the LIHPRHA FMV appraisal to calculate the owner's equity in Chauncy House. Id. at 102.  In turn, the owner's equity figure produced by that calculation is used to calculate economic loss. Id. at 112.  In sum, rather than explaining why the LIHPRHA FMV appraisal is wrong, Dr. Wade bases his analytical framework upon the LIHPRHA FMV appraisal.  Either Dr. Wade's has employed an inaccurate LIHPRHA FMV appraisal in his economic loss calculation for Chauncy House, or that same LIHPRHA FMV appraisal figure is accurate and demonstrates that Dr. Wade's

economic loss figure for Chauncy House is grossly inflated.  The court sees no logic in Dr. Wade's economic loss findings regarding Chauncy House.

c.      Rock Creek – a LIHPRHA Use Agreement Plaintiff

Including a minor adjustment for completed repairs to the property, Dr. Wade again relies on the LIHPRHA FMV appraisal to calculate the owner's equity in Rock Creek at the time of the taking.  Id. at 115.  Once the owner's equity is established by this calculation, Dr. Wade uses the equity figure to calculate economic loss.  Id. at 131.  Thus, in support of the economic loss finding of $8,014,386 for Rock Creek, Dr. Wade again depends on the accuracy of the LIHPRHA FMV appraisal.  In this respect, the use of the LIHPRHA FMV appraisal in the Rock Creek analysis reinforces the court's view that Dr. Wade's reliance on LIHPRHA FMV appraisals contradicts any reasonable inference that his Chauncy House economic loss finding is logical.

Dr. Wade's economic loss finding for Rock Creek is different, however, than his economic loss finding for Chauncy House, because a LIHPRHA use agreement plaintiff's circumstances are not the same as a LIHPRHA sale plaintiff's circumstances.  There is no sale figure for Rock Creek.  Thus, the $8 million loss figure is not fundamentally illogical on the grounds that it cannot be reconciled with a LIHPRHA sale figure.  The flaws in Dr. Wade's economic loss finding for Rock Creek are inherent in his methodology: (1) There is no comparison of FMVs for Rock Creek, with or without the mortgage prepayment right; (2) Dr. Wade does not opine as to the correct pair of FMVs for Rock Creek, so that the court could compare those FMVs and perform the first step of the analysis required by Independence Park I and Independence Park II; (3) Dr. Wade measures economic loss as benchmarked to the owner's equity in the property, which is improper; and (4) Dr. Wade's measures of the severity of the economic loss for Rock Creek, ECF No. 441-4 at 61, 69, are fundamentally flawed and not probative of this issue.

IV.    Conclusion

Plaintiff 620 Su Casa Por Cortez lacked distinct investment-backed expectations in the mortgage prepayment right allegedly taken by the Preservation Statutes, and its claim must be dismissed.  All of the First Wave Plaintiffs—Buckman Gardens L.P. (and the individual partners in Buckman Gardens), Chauncy House Company, Cedar Gardens Associates, Rock Creek Terrace L.P., 620 Su Casa Por Cortez, and 3740 Silverlake Village, L.P.—have failed to produce sufficient evidence on the economic impact prong of Penn Central to prevail at trial, and their claims must be dismissed.  Accordingly,

(1)    Defendant's Motion for Summary Judgment, ECF No. 422, is **GRANTED**;

(2)    The clerk's office is directed to **CORRECT** the docket in Case No. 93-6582 to change the name of the plaintiff from Silverlake Village, L.P. to **3740 Silverlake Village, L.P.**, as explained in footnote 4 of this opinion;

(3)     For docket clarity, a copy of this opinion shall be filed in each of the six member cases;

(4)     The clerk's office is directed to **ENTER** final judgment for defendant and **DISMISS** all of the claims in **each** of the following member cases, **with prejudice**:

    (a) Buckman Gardens L.P., et al. v. United States, Case No. 97-5837;

    (b) Chauncy House Company v. United States, Case No. 97-5845;

    (c) Cedar Gardens Associates v. United States, Case No. 93-6568;

    (d) Rock Creek Terrace L.P. v. United States, Case No. 93-6578;

    (e) 620 Su Casa Por Cortez v. United States, Case No. 93-6580; and

    (f) 3740 Silverlake Village, L.P. v. United States, Case No. 93-6582;

(5)     Plaintiffs' Motion in Limine, ECF No. 430, is **DENIED** as moot;

(6)     Defendant's Motion in Limine, ECF No. 452, is **DENIED** as moot;

(7)     The pretrial conference scheduled for September 27, 2018, is **CANCELLED**;

(8)     The trial scheduled for October 15-26, 2018, is **CANCELLED**; and,

(9)     On or before **October 22, 2018**, the parties shall **CONFER** and **FILE** a joint status report proposing further proceedings in this matter.

IT IS SO ORDERED.


                                    s/Patricia Campbell-Smith
                                    PATRICIA CAMPBELL-SMITH
                                    Judge